(Surrogate's Court, New York County. February, 1912.)

1. DEATH (§ 6*)—SURVIVORSHIP—EVIDENCE.

Where a husband and wife were killed by collision of an automobile with a train, testimony of the fireman on the locomotive that when the engine stopped and he first saw the husband, he was dead, but that the wife, whom he next saw, was alive, was competent on the question as to whether the wife survived the husband.

[Ed. Note.—For other cases, see Death, Cent. Dig. §§ 8, 9; Dec. Dig. § 6.*]

2. WITNESSES (§ 397*)—CREDIBILITY—CONTRADICTORY TESTIMONY.

Where, on judicial settlement of the accounts of an executrix as to whether the wife survived her husband when both were killed in an automobile accident, the fireman of the train with which it was in collision testified that, when he stepped from the engine, the husband was dead, but the wife was living, his previous testimony at the coroner's inquest that while he was at the scene of the accident the wife was dead was not so inconsistent with his later testimony as to compel its rejection; his attention not having been directed to the signs of life which he first detected in her.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 1265, 1266; Dec. Dig. § 397.*]

In the matter of the judicial settlement of Edward Herrmann, executor of Mrs. Laffargue. Decree rendered.

See, also, 143 App. Div. 910, 127 N. Y. Supp. 1128; 202 N. Y. 614, 96 N. E. 1118.

Edwin T. Taliaferro and E. B. Wilson, for petitioner.

George D. Zahm, for executor of estate of J. George Laffargue.

FOWLER, S. The matter comes before the surrogate on a petition of Laura Blakeny (who is the executrix of her mother, the widow of J. George Laffargue) for a judicial settlement of the accounts of Edward Herrmann, as the executor of the estate of J. George Laffargue, deceased. In the first instance a citation issued out of this court, directed to the executor of J. George Laffargue only. The executor appeared and filed an answer, denying in substance that Mrs. Laffargue survived her husband, J. George Laffargue, as both perished in a common disaster. Mrs. Laffargue left surviving her two daughters of her former marriage. Mr. Laffargue left two sons of his former marriage. Thus the two daughters are now claiming against the two sons distributive rights in the estate of Mr. Laffargue, Sr., the father of the sons.

If Mrs. Laffargue did not survive her husband, her executrix has no standing in this proceeding. This being the condition of the proceeding, an order of reference seems to have been thereupon made to take proof and report the evidence with the opinion of the referee thereon as to whether Mrs. Henrietta Laffargue survived her husband. The referee reported that she did survive, whereupon the surrogate for this county made an order adopting the first finding of the referee, and directing the executor to account. This order was appealed from and modified by striking out the finding of survivorship (142 App. Div. 426, 126 N. Y. Supp. 965, affirmed 202 N. Y. 614, 96 N. E. 1118), and substituting a right to account. Thereafter supplemental citations were issued in conformity with such opinions, the compulsory and voluntary accounts were consolidated, and the matter is now again regularly before the surrogate, and, by the request of the parties, the surrogate consented to take the evidence offered, and to determine himself de novo the single question of fact now presented to him in this matter.

The single issue of fact thus presented to the surrogate is, "Did Mrs. Laffargue survive her husband?" If not, neither her daughters of her former marriage nor her executrix is entitled to take any part of the estate bequeathed by the will of J. George Laffargue to their mother. On the part of the executrix of Mrs. Laffargue, it is alleged that Mrs. Laffargue survived her husband. Such survival is denied, in substance, by or on the part of the sons of Mr. Laffargue's first marriage. Upon the determination of the issue of survivorship depend the further proceedings in this matter.

It appears from the evidence that on the 18th day of August, 1906, J. George Laffargue and his wife, with two friends, Mr. and Mrs. Lurch, were motoring along a public highway in or near Allaire, in the state of New Jersey. In attempting to cross the tracks of the Pennsylvania Railroad Company at a grade crossing near the station for Allaire, the automobile, containing the four occupants named, was struck by a passenger train, running at a very high rate of speed (60 to 65 miles an hour), by reason of which all the persons named met their death, with the single exception of Mr. Lurch, who was so desperately injured as to be unable to give any evidence in this pro-

. ceeding concerning the catastrophe. At least Mr. Lurch was not called to the stand before me for the reason stated in open court by the counsel for all parties.

It is but proper that the surrogate should state at the outset of this opinion the rules which, as he conceives, apply to the evidence taken in this matter and which he attempted to apply in the reception of the voluminous evidence offered as bearing on the question of actual survivorship, for on the integrity of these rules and their correct application the validity of the conclusion may depend.

Had both Mr. and Mrs. Laffargue after the catastrophe been found to be dead beyond all question, and nothing more been given in evidence concerning the time of death, there would by the common law be no presumption of survivorship; nor would there be a presumption of simultaneous death, as the common law, with¹great reserve, refuses, under such circumstances, to indulge in any presumption whatever on this subject. At common law the question of survivorship in common disasters is regarded as insoluble, or, as it is said, "as unascertainable," without some actual evidence bearing on the question of a survivorship de facto. Wing v. Angrave, 8 H. L. Cas. 183; Matter of Alton (1892) Prob. Div. 142; Matter of Johnson, 78 L. T. Rep. 85; Matter of Benyon (1901) Prob. Div. 141; Matter of Good, 24 L. T. Rep. 439; Taylor, Ev. §§ 202, 203; Stinde v. Goodrich, 3 Redf. Sur. 87; Newell v. Nichols, 75 N. Y. 78, 31 Am. Rep. 424; St. John v. Andrews Institute, 191 N. Y. 254, 276, 83 N. E. 981, 14 Ann. Cas. 708; Young Women's Christian Home v. French, 187 U. S. 401, 23 Sup. Ct. 184, 47 L. Ed. 233.

The refusal of the common law to indulge in all presumptions concerning the exact time of the death of commorientes is sometimes contrasted with the liberality of the civil law on the same subject, and it is stated with some censure implied that the civil law indulged in overrefinement on this matter. This is not altogether accurate. The presumption of the civil law in respect of survivorship extended only to parents and children, and was founded on public policy, designed to keep inheritances in a stated line of devolution. D. 34, 5, 16; D. 34, 5, 18 Pr.; D. 34, 5, 22; D. 34, 5, 23. In the instances of the survivorship of those who were not parents and children, where the rights of one depended on the prior death of another, as in case of inheritance or legacy, such rights could not under the civil law be availed of without actual proof of a prior death of a party against whom the succession was claimed. D. 34, 5, 16, Pr.; D. 34, 5, 17. Thus it will be seen that, as a general rule, the civil law, like the common law, required actual proof of survivorship in order to determine rights which attached to such survivorship. It may be remarked that the superior wisdom of our law in the instance of children and parents, commorientes, is not always so obvious as is sometimes stated in the books. While we should always prefer and apply the law of our own state and nation rather than any foreign law, yet we should be just to that great system which helps to rule the world of civilization. This is especially true in this tribunal where many doctrines of Roman origin are of frequent application.

That the alleged survivorship of Mrs. Laffargue must be proved in this cause, by those alleging it, and claiming through and under Mrs. Laffargue, cannot be questioned. Jones, Ev. § 64. This being conceded, if there are any facts concerning the disaster, however minute, which throw light upon the question of survivorship, such facts, subject to the general rules of evidence, seemed to the surrogate to be admissible evidence on the issue now on trial. Newell v. Nichols, 75 N. Y. 78, 31 Am. Rep. 424; Underwood v. Wing, 19 Beav. 459; Will of Ehle, 73 Wis. 445, 41 N. W. 627. This last rule would seem to admit circumstantial evidence, not only in the absence of direct evidence, but also in aid of direct evidence. Dowling v. Dowling, 10 Ir. L. R. 236. This last point I now emphasize because it bears upon the contention of counsel that, in the absence of direct evidence, circumstantial evidence is little better than a presumption of survivorship which the common law does not tolerate. But an inference from circumstantial evidence the surrogate conceives to be a very different thing from a presumption in the absence of all evidence.

Certainly where there is any proof that one of the parties is living when the other party is supposed to be dead, the trier of the fact (jury or surrogate indifferently and as the case may be) may then consider, under common-law rules of evidence, all the circumstances of the parties whose time of death is in controversy, including their respective ages, sex, and health. Pell v. Ball, Cheves, Eq. (S. C.) 99; Underwood v. Wing, 19 Beav. 459; Broughton v. Randall, Cro. Eliz. 503. Such evidence is received not as the basis of a presumption, but as corroborative or otherwise of actual evidence of survivorship.

It was in view of this distinction, just pointed out, that the surrogate allowed in evidence much circumstantial evidence relevant to the health and the nature of the several wounds of both Mr. and Mrs. Laffargue. Standing alone, such matters would have been irrelevant except to a presumption of survivorship. But, as the testimony developed, they were circumstances which bore upon the direct evidence of an actual survivorship. Thus such circumstances became competent in this cause under the adjudications cited above.

It is necessary to advert to but one more point in the law of evidence governing the investigation. It is claimed on the part of Mr. Laffargue's own heirs that the law favors the male heirs of Mr. Laffargue. This rule the surrogate conceives to be related to the interpretation of translative documents affecting heirs at law and to have no reference to the weight of evidence on an issue of fact. Here the matter is not one of favorable interpretation of a will, but of the weight of the evidence. The surrogate knows of no current maxim of our law which in this investigation "favors" one side of the issue more than the other.

With this pronouncement of the evidentiary rules applicable, or deemed to be applicable, by the surrogate, to the issue of survivorship, we are prepared to consider the great mass of evidence offered by the parties on the hearing. Much of this evidence is at hopeless odds, while some of it is but remotely relevant. It is by reason of this fact

extremely difficult for the surrogate to extract the matters which bear most heavily on the issue. It is established that the bodies of Mr. and Mrs. Laffargue and the body of Mr. Lurch were hurled by the tremendous impact of the great train, which struck their automobile, on or near to the station platform, and that the automobile itself was dashed into fragments. By one of those singular variations of force Mr. Lurch was not killed outright, but he was rendered by his shocking injuries oblivious of all the details of the occurrence. After being struck there was a blank in Mr. Lurch's mind never filled. There appears to have been no station master on duty at the little wayside station when the express sped past, and thus this tragedy was practically unobserved by witnesses, with one exception, Hyers, the locomotive fireman. The bodies of the victims were found, under the circumstances I am about to advert to, ranged on or near to the station platform. On the testimony of their first finder, or finders, as to the condition of the bodies, depends the issue of survivorship, so vigorously contested in this proceeding.

[1] It is conceded by the counsel for Mr. J. George Laffargue's own proper heirs that the survivorship of Mrs. Laffargue depends wholly on the testimony of Hyers, the fireman on the train locomotive. The main efforts of such counsel were directed on the trial to the impeachment or contradiction of Mr. Hyers. It was Mr. Hyers who, while on duty on the locomotive, first detected the imminence of, the collision which destroyed Mr. and Mrs. Laffargue. Except Mr. Hyers no one else may be regarded as a witness of the disaster. Thus Mr. Hyers is the leading witness in the cause. This witness swears in substance that as soon as he could, before the engine came to a stop, he repaired to the scene of the disaster. He first came to Mrs. Lurch. He placed the severed head of Mrs. Lurch near her body. Then he came to Mr. J. George Laffargue's body. Through Mr. Laffargue's head was a large bolt entering the right temple and emerging an inch or two from the left ear. Witness then proceeded to the body of Mrs. Laffargue, lying on the station platform with her head toward the railroad track, "her legs crouched up under her" and exposed. As witness approached Mrs. Laffargue he states that "she straightened her legs out on the platform, and brought them up again and straightened them out again." As she did so, witness pulled her clothes down, and covered her legs up; no one else then being present. Witness then proceeded to look at the next person in order of approach, Mr. Lurch, and lifted part of the automobile off of him. At this point witness saw a lady coming down the main road, and he walked to her and accosted her, it seems asking her address, which she refused. Mr. Hyers was exposed to a minute cross-examination which served to develop the details given on the direct examination, and I think strengthened the testimony of the witness. In the course of his examination the witness testified directly, over an exception to the questions, that when he first saw Mr. Laffargue the latter was dead, but that Mrs. Laffargue was alive. If this testimony is true and competent, it ends the controversy, for Mrs. Laffargue is proved to have survived her husband. How long is inconsequential.

Now, who is the witness Hyers? At the time of the casualty he was a fireman employed on the train engine. At the date of the trial he was a regular locomotive engineer in the service of the Pennsylvania Railroad Company. This means that he was a man of serious occupation and honorable station in the community. Mr. Hyers had no interest in this controversy between the heirs of Mrs. Laffargue and the heirs of Mr. Laffargue. No bias or partiality on his part was established. The surrogate saw this witness in court. Neither his excellent bearing nor his frank appearance on the witness stand denoted in any wise an untruthful person. Yet, if the position of Mr. Laffargue's heirs in regard to Hyers is sound, he is a false witness, and his testimony must be ignored in our conclusion. The discrepancies in Hyers' testimony on his direct and cross-examinations do not seem to be great, considering the lapse of time since the casualty. The man was a hardy railway operative, rendered keen and alert by the exacting necessities of his arduous training and calling. Doubtless the shock of a great catastrophe and his first desire to exculpate the railway servants from all blame centered his attention on the accident in the abstract rather than in the concrete, and his failure to minister immediately to those he claims were the survivors of the tragedy may be thus accounted for. His failure to so minister in the first instance may be as abhorrent to humanity as is claimed by counsel, but the surrogate is not here to determine its consistency with the dictates of humanity but with the truth. The truth of Mr. Hyers' testimony is the only matter before the surrogate.

In so far as Mr. Hyers' testimony is that Mrs. Laffargue was alive and Mr. Laffargue dead at a particular point of time, it would seem that the question to elicit it was competent and the answer both competent and conclusive, unless Mr. Hyers' statement that Mrs. Laffargue was alive and Mr. Laffargue dead is impeached, contradicted, or unworthy of belief. I think that the question was competent. Death and life are matters of fact. There are some statements of fact by a witness permitted in law, although they may involve mental operations which are singularly like opinions, in that they are resultants or inferences from concrete and primary facts not detailed or susceptible of detail by the ordinary witness. That such inferences are opinions, in terms of the law of evidence, has been denied (see Harlan, J., Connecticut Mutl. Life Ins. Co. v. Lathrop, 111 U. S. 620, 4 Sup. Ct. 533, 28 L. Ed. 536), although they are classified by some writers on the law of evidence as exceptions to the rule excluding the opinions of witnesses. See De Witt v. Barly, 17 N. Y. 340, 353. Whether exceptions or not, such complex inferences as that a person is drunk or sober, angry or pleased, affectionate or cross, are commonly allowed to be stated by witnesses. So witnesses may generally testify as to their conclusions regarding light and color, and as to the weight, identity, and physical conditions of a person. These things are treated as facts in all courts, although the testimony is the result of inferences based upon complex conditions not detailed. Blake v. People, 73 N. Y. 586; People v. Eastwood, 14 N. Y. 562; Greenfield v. People, 85 N. Y. 75, 39 Am. Rep. 636; Young v. Johnson, 123

N. Y. 226, 233, 25 N. E. 363; McKee v. Nelson, 4 Cow. 355, 15 Am. Dec. 384.

Such inferences as those specified are aptly described as instantaneous conclusions of the mind from a variety of facts, partly consciously perceived and partly unconsciously perceived, or, in other words, apprehended. The ordinary witness could not give in detail the deductive processes or methods by which his inference was reached. The law of evidence would be a travesty if such a requirement were necessary in matters of common observation and daily experience. It is not true in a large range of matters that nonexperts may not by the rules of judicial evidence state their belief. Their opinions or beliefs may be stated on disputed identity, resemblances, handwriting, mental and physical conditions, age, speed, character, and on some other matters of common and daily observation within the actual experience of the witness. That an ordinary eyewitness may state "that a person is dead," or "alive," I have no doubt, provided he has been first interrogated as to the circumstances under which he arrived at his conclusion, and such circumstances justify the inference by the judge that the witness has seen what he believes and states. It would be a curious valuation of judicial proofs if formal theories of evidence excluded the testimony of Hyers that Mr. Laffargue was dead and Mrs. Laffargue alive at the same moment. It is to be observed that, in turn, counsel for either side put the obnoxious question in the same form. This may have been a waiver of all objections.

It is claimed on the part of the sons of Mr. Laffargue that Mr. Hyers' testimony is to be disregarded, in the next place, because he is contradicted by witnesses, and next because he has forsworn himself by his earlier testimony at the coroner's inquest. The witnesses offered to contradict Hyers are several plumbers who apparently were catching a ride on the express train which struck Mr. Laffargue's automobile. I have read their depositions and evidence with scrutiny and care. The variation in their testimony as to the positions of the four victims is apparent, but Clayton agrees with Hyers that Mrs. Laffargue's body was next to Mr. Lurch. This corroborates Hyers in one important point. That Hyers reached the scene of the accident first I am convinced. It would be natural that the trainman who first saw the collision should reach the scene of the disaster first in order. That he then saw what he states I believe. That other persons soon afterward came to the scene is probable. How soon is conjectural or uncertain. That Mr. Laffargue had when Hyers first saw him a bolt through his head as Hyers states is corroborated by the testimony of the undertaker who carried away and prepared the bodies of the victims for burial. The undertaker's testimony is important only in view of its incidental confirmation of Hyers' testimony that Mr. Laffargue was dead when he arrived. A man found with a large wound extending through the head from one temple to the rear of the opposite ear, and with a long piece of metal of large width penetrating his abdominal cavity and possibly extending upward into the region of his heart, or, if not, entirely concealed within his body until extracted by the undertaker, must have been dead when found as Hyers

states. I am aware that the celebrated "crowbar case" tends to prove that all penetrations of the brain are not instantly fatal. That the particular instrument causing the wound in the head of Mr. Laffargue disappeared in the excitement incidental to the occasion is not, however, fatal to the truth of Hyers' statement. But I believe the nature of the head wound of Mr. Laffargue shows that it must have been instantly fatal, notwithstanding the survival in the "crowbar case." The cause of the abdominal wound incurred by Mr. Laffargue was produced before me on the trial because it was concealed for some time in his body and was extracted subsequently only with difficulty. I may observe that the expert testimony threw so little light on the issues as to form no part in my conclusion.

The position and order of the several bodies when found I do regard as indirectly of some importance, although it was not adverted to by the counsel on the hearing before me. If, as Hyers and Clayton both state, the body of Mrs. Laffargue when found at the station lay next to Mr. Lurch, who survived the collision, it would tend to show that both Mrs. Laffargue and Mr. Lurch may have met the impact of the train at a more favorable angle or second of time. Both Mrs. Lurch and Mr. Laffargue, whose bodies came first in order, must have been more directly in the line of greatest resistance and force or momentum. But, whether this inference of mine is or is not accurate, it is certain that Lurch lived, and that Mrs. Laffargue, who was next him, is testified by Hyers to have been alive when first seen by him. The order of the bodies may then be regarded as the more consistent with life and survivorship.

[2] But it is unnecessary for me to review in detail all the testimony offered in support of survival, or to assign all the reasons which induce me to believe that Hyers told me the truth under oath. That his testimony at the coroner's inquest, if unexplained, varies from his testimony on the stand, is apparent. But it is not so inconsistent with his latest statement under oath as to be directly contradictory of the latter, nor does it compel me to reject his testimony. The testimony which he gave at the inquest was directed to the cause of an established death and Hyers there testified truthfully that at some time while he was at Allaire Mrs. Laffargue was dead. I do not think before the coroner his attention was directed to the signs of life which he first detected and later swore to before me. I am unwilling to reject the positive testimony of this apparently respectable and disinterested witness that Mrs. Laffargue was alive and Mr. Laffargue dead at the same moment of time. If I do not reject it, I am bound to find that the petitioner has made out her allegation that Mrs. Laffargue survived her husband, for Hyers' testimony is not contradicted and is credible. The decree and further proceedings herein may provide that Mrs. Laffargue survived her husband.

Decreed accordingly.