In the Matter of the Estate of PRITCHARD H. STRONG, Deceased.

Surrogate's Court, Monroe County, May 11, 1939.

*Hubbell, Taylor, Goodwin, Nixon & Hargrave*, for Fred C. Goodwin and Lincoln Alliance Bank and Trust Company, as executors, etc.

*A. E. Sutherland, Jr.*, special guardian.

*Harris, Beach, Folger, Bacon & Keating* [*J. G. Dale* of counsel], for certain hospitals.

FEELY, S.   In and by this their first and intermediate judicial settlement the executors of the above-named testator ask that his last will be construed in several respects, most of which have some relation to the fact that testator and his wife died at the same time in the crash of their airplane on August 27, 1937.

In and by his last will, dated January 4, 1936, testator, in brief, provided for the payment of his debts, etc.; and in the second paragraph bequeathed some jewelry to his wife.   In the third paragraph he made four separate gifts of the entire residue of his estate, including what he might receive as heir of any person, and having in mind the provision in the will of his father, H. G. Strong, including also any and all property in respect to which he might have a power of appointment, or which he was authorized to dispose of by will.   By subdivision A of this general residuary clause he did " give and bequeath " to two hospitals " an amount equivalent to " one-tenth of his net estate, but not to exceed $250,000 in any event; by subdivision B he gave one-fifth thereof to his wife absolutely; and by subdivision C he gave a quarter to trustees to pay the income thereof to his wife for her life, with the remainder over into the trust for his only child, a daughter, which was created by subdivision D, wherein he gave the remaining nine-twentieths of the estate to a trustee for the benefit of his daughter until she became of full age, when she is to have the unused income, and all the income from then on, until she became twenty-five, or sooner die, and the corpus is to be hers at twenty-five to the extent of one-third, and another third at thirty, and the last third at thirty-five. The residue, in case of her death, is given to her executor or heirs.

The fourth paragraph authorizes the trustee to advance from corpus of the daughter's trust any extraordinary expenses, not reasonably payable from the income to her, or for the purpose of enabling her to purchase a home, if that be deemed necessary or

advisable, or to take any other step, the expense of which cannot be paid from income sources available to her, and which shall, in the opinion of the trustees, be for her best interests.

The fifth paragraph appoints a testamentary guardian, and the sixth names the executors who, under the seventh, are freed from the duty of giving a bond as such. The eighth paragraph confers a power of sale in general terms, and contains certain directions as to investments, without explicitly referring to real estate.

At the same time that testator executed his will, his wife, Margaret E. B. Strong, also executed her last will, in the presence of the same witnesses, in which the main provision is for the only child of her marriage with the aforesaid testator, a minor, Ann Emerson Strong, who was born June 15, 1928. In and by her last will testator's wife, in brief, bequeathed some jewelry to their said daughter and some silverware to her husband. To the latter she also devised the so-called Allen creek property. To her brother she bequeathed $50,000, and then created a trust on $180,000, the income on which is to be paid half to her mother and half to an aunt for their respective lives, with remainder over to the estate of the testatrix. By the fifth paragraph she placed in trust all the rest of her estate, including any property or interest therein with respect to which she might have a power of appointment, or which she might be authorized to dispose of by will. This trust was for the benefit of the daughter for her life with remainder over to the daughter's issue, or heirs, with a power of testamentary appointment in the daughter upon her reaching the age of twenty-five years.

The sixth paragraph provides that if the husband of testatrix should die before she did, then she appointed as testamentary guardian of their daughter a named friend.

The will then named her husband to be executor, and conferred general powers on the trustee.

Neither will made any specific provision for the case of simultaneous death.

I. Those two testamentary plans are far from being reciprocal, although they manifest a mutual interest in the only child of these testators. Even in the typical setting, where the claim of reciprocity is usually set up, because each spouse leaves all to the other by wills executed at the same time and before the same witnesses, the rule has long been established that something more than even such great similarity is required; and that in addition thereto an agreement to make such counterpart wills must be clearly and satisfactorily proven, and that proof by presumption is insufficient. (*Matter of Rosenblath*, 146 Misc. 424.) In this case these wills are

in separate writings, neither of which makes any express reference to the other. Only in the husband's will is mention made of any property he might receive " as the heir " of any person, which may refer to the intestacy of some person other than his wife. The mere fact that each will was drafted in the same law office, and signed there on the same day, and attested there by the same lawyers, implies that each testator knew of the other's will, but this falls far short of making them reciprocal or mutual wills, or wills executed in pursuance of an agreement to make such wills as these are. The most that can be said of them is that they are simultaneous wills, but not similar, nor interdependent. There is no proof in this case that there was any agreement requiring this couple to make any such wills.

II. That these testators are the identical persons who, with their friend, and also with their airpilot, died together in the crash of this testator's airplane in a thicket near Albany, N. Y., in a fog in the early hours of August 27, 1937, has been established to the satisfaction of this court, and is commonly accepted as the fact by all their relatives and friends.

The allegation of the petition to the effect that testator and his wife, and the two other persons named, all died at the same time in the common disaster above described has not been controverted, and has also been established to the satisfaction of this court.

For over sixty years the rule in this State has been that either survival, or simultaneous death, is a fact to be alleged and proved by the one claiming to benefit thereby.

" There is no presumption of survivorship between * * * persons who perish in a common disaster, nor is there a presumption that * * * death occurred to all at the same instant and yet through necessity, in the administration of the law the title to real property passes and personal property is distributed as if they all perished at the same instant of time in the absence of proof of facts showing survivorship among them." (*St. John* v. *Andrews Institute for Girls*, 117 App. Div. 698; modfd., 191 N. Y. 254.) Neither spouse is entitled in such case to participate in the estate of the other. (*Matter of Burza*, 151 Misc. 577.) So, when husband and wife die at once, his will leaving all to her does not become effective so as to pass by a residuary clause in her will (*Matter of Lott*, 65 Misc. 422); nor can the wife's heirs take as a result of the husband's will leaving his property to her. (*Matter of Herrmann*, 75 Misc. 599.) In the *Lott* case (*supra*) the husband had made his wife the sole beneficiary under his will; and she being his only legatee, the disposition of his individual estate was in accordance with the laws which govern in case of intestacy. In the *Burza*

case (*supra*) neither he nor his wife left a last will. His individual estate passed by operation of law to his next of kin; and hers passed likewise to her kindred. Simultaneous death of a married pair, therefore, does not prevent their respective heirs or legatees from succeeding to the property individually owned at death by their respective ancestor or testator; but merely prevents one of the couple from succeeding to the property of the other whether by statute, by will, or by the entirety or by contracts of survivorship.

III. In regard to the residential real estate at No. 2700 East avenue in this city, which was held by the testator and his wife as tenants by the entirety, the question is presented for the first time in this State, in so far as research of counsel has disclosed, as to the effect on such tenancy of the simultaneous death of the husband and wife, although the point has been passed upon in two other States.

Tenancy by the entirety is based on the old theory of marital unity (*Jooss* v. *Fey*, 129 N. Y. 17), under a valid marriage. (*Armondi* v. *Dunham*, 221 App. Div. 679.) In some circumstances a tenancy in common has been held to result when the marriage bond has been dissolved by an absolute divorce having been granted one of the parties. (*Stelz* v. *Shreck*, 128 N. Y. 263; *Matter of Dell*, 154 Misc. 216, 218.)

"With this change in their relations, a corresponding change of the tenancy dependent upon the previous relation must necessarily follow" (13 R. C. L. 1122); and the courts generally have approximated the latter to the former in so far as they deemed proper; but only a few jurisdictions have gone so far in this way as to continue the tenancy by the entirety intact even after an absolute divorce. (52 A. L. R. 893.) The reason given for this minority view is that "a subsequent unity of persons cannot change a tenancy in common to one by the entireties, and conversely a subsequent severance of unity of person ought not to change a tenancy by the entireties to one in common."

On this theory it has been held that where a couple holding land by the entirety were divorced, the wife was entitled to receive half of the rents of such land so long as both live, and that upon the death of either the entire property should go to the survivor. (13 R. C. L. 1123.) This ruling seems to place more emphasis on the entirety feature than do most jurisdictions which hold this incidental arrangement to be subordinate to the matrimonial relation of the parties. These rulings construe the entirety to be dependent on the duration of the marriage relation. The continued ownership of the property is also a factor in some cases.

To some extent the contractual feature of a tenancy by the entirety seems to have been influential in our rulings that a severance of a tenancy by the entirety cannot be effected by the unilateral last will of one of the spouses alone. (*Levenson* v. *Levenson*, 229 App. Div. 402, 406.) Neither spouse in a tenancy by the entirety can maintain an action to partition the fee (*Vollaro* v. *Vollaro*, 144 App. Div. 242), although they are tenants in common of the use, or rental value. On the theory of unity is based the right of the survivor to the whole estate when death of a spouse has dissolved the marriage. (*Armondi* v. *Dunham*, 221 App. Div. 679, 681.) "In a tenancy by the entirety, the survivor takes the estate 'not by right of survivorship simply, but by virtue of the grant which vested the entire estate in such grantees.'" (*Matter of Klatzl*, 216 N. Y. 83, 87; *Hiles* v. *Fisher*, 144 id. 306.)

"The parties do not hold by moieties, but take as one person, taking as a corporation would take." (13 R. C. L. 1114.)

In the simultaneous death of both spouses there is no survivor; nor can one then transfer anything to the other; and the marriage bond is dissolved more absolutely, one might say, than by a decree of divorce. Hence, it is quite along the line of our ruling above mentioned that the Supreme Court of Iowa held that in the absence of proof of survivorship of one of two persons perishing in a common disaster in whose favor a will was made by the other, the property must be deemed to have passed under the statute of intestate distribution. (*Carpenter* v. *Severn*, 201 Iowa, 969; 204 N. W. 448.) There a husband and wife were killed at the same moment in their automobile in a collision at a railroad crossing. A similar ruling was made in Tennessee in the case of *McGhee* v. *Henry* (144 Tenn. 548; 234 N. W. 509), where a husband and wife had died simultaneously in a fire that destroyed their dwelling. They had held their land by the entirety. In a partition action among their respective "heirs," the court ruled that the estate descended as if they had been tenants in common, going half to each group, and not one-sixth to one group and five-sixths to the other. This ruling is based on prior local decisions there on the effect of a divorce destroying the matrimonial union. The record is silent on the subject of relative contribution. Like rulings have been made in States where the community property system obtains.

The "tenancy in common" that is said in some jurisdictions to succeed an entirety that has been destroyed by divorce, cannot, upon the simultaneous deaths of spouses, spring into existence between the two spouses in *articulo mortis*, nor can the term "joint tenants" be immediately applied there, as it is applied in some jurisdictions to spouses in a case where their entirety holding was

being dissolved by a decree of foreclosure and sale (see *William* v. *Safety Savings & Loan Assn.*, 228 Mo. App. 135; 58 S. W. [2d] 787); for in the latter case, as in divorce *a vinculo*, the two persons survive the decree and in most jurisdictions can then hold only in common; whereas when both spouses die together, the term "tenancy in common" can refer only to their respective heirs or legatees, as the case may be one of testacy or of intestacy; and as either spouse may be deemed to have had anything to transmit at death, or to have been a source or subject of succession.

The question has been more particularly stressed in this case as to what interest, if any at all, passed from each spouse; because the claim is made, without contradiction, that this testator husband paid the entire purchase price both for the East avenue entirety, as well as for a like holding in Florida. The special guardian argues for an equal division both of the former fee, and of the proceeds of sale of the latter.

The difficulty arising out of utter inability to ascertain what amount, if any, either spouse contributed to the creation of an entirety would probably be resolved by holding that as between the two houses or groups of heirs or legatees the shares or rights were presumptively equal in the constructive tenancy in common superseding the entirety at the time of the simultaneous deaths of the spouses.

Where, however, the husband, for example, at the creation of the entirety, furnished all the property that was held in such tenancy, the most the non-contributing wife can be said to have received — aside from an absolute right to half the rents during the marriage — is an irrevocable right to retain the whole fee upon her surviving her husband as his lawful wife. In this sense, she is said to hold "*per tout*, and not *per my*."

This irrevocable right of survivorship is what differentiates the entirety holding from the case where a mere joint tenancy exists between spouses, which ordinarily would be revocable at the will of either, and thus reducible to a tenancy in common, either in shares proportionate to the original contributions, in so far as ascertainable, or if unascertainable, then in presumptively equal shares. (See *Matter of Kaupper*, 141 App. Div. 54, 57; affd., 201 N. Y. 534.)

Where the simultaneous death of spouses holding by the entirety has frustrated this right of survivorship, all the non-contributing wife can be said to have lost is her right to future rents, and her sometime right to retain the whole fee as surviving spouse.

On the other hand, whatever of value in property the wife had contributed to the creation of the entirety, passed from her at the destruction of the entirety by the simultaneous deaths; but in that

event, under the rulings above cited, her contribution could not pass to her husband, nor to those succeeding to his interest or estate. Her contribution, therefore, should be regarded as something she could have transmitted to others either as a testatrix or as a stock of descent.

In the case at bar there is a mixed situation, in that each spouse has left a last will, wherein each made provision, not only for the other spouse outliving the maker of the will, but also for third persons; and each will purports to dispose of their entire estate, and carries a general residuary provision, such as is generally construed to be a " catch-all " provision whereby a testator is deemed to have included anything whatever, foreseen or unforeseen, that might fall to his estate after the date of the will and belong to him, however unexpectedly, at the moment of death. Simultaneous death not having been provided for, portions of each of these wills, by reason of conditions subsequently arising, have failed of effect; with the result that some of the husband's residuary estate, into which his contributed interest in the extinguished entirety necessarily fell, must now be regarded as having become the property of his heir as in intestacy.

IV. Certain particular conclusions follow therefrom. The minor daughter of this testator must be held to have thus become the owner at her father's death of one-fifth of his undivided interest or initial contribution, in whatever amount it was, to the creation of the entirety in the fee of the residence in this city, and also in the home in Florida. The fact is not disputed that each of those entireties were created wholly out of his means alone.

Under his will, the legacy of one-fifth of the general residue, intended for his wife, was frustrated by the simultaneous deaths; and this fifth, by reason of the peculiar ruling mentioned in the *Wright* case (*infra*), passed at once from him to his only child as in intestacy. It included whatever interest he had at death in the property sometime held by the entirety, which was, apparently, the whole thereof. The rest of his residual estate, including the rest of the interest from the sometime entirety, passed as part of the general residue, under the other provisions of the third paragraph of his will.

Survival, which is the underlying condition of a legacy to a wife, being lacking here, and unprovided for by the statute against lapsing, the legacy of jewelry, etc., to his wife in the second paragraph of this testator's will must now be deemed to have failed and lapsed utterly; and to have fallen as intestate property into the general residue of the estate, as to which provision is made by the third paragraph of this will.

For the same reason the legacy to the wife of one-fifth of the general residue of the estate under subdivision B of this fifth paragraph must also be deemed to have lapsed and failed as such. Although this legacy was planned as a part to be carved out of the general residue, yet under the peculiar rule still obtaining (*Wright v. Wright*, 225 N. Y. 329, 341), that there is no residue of a residue where the will — as in the case at bar — does not expressly make the residuary interests joint, nor provide for survivorship or cross-remainders among the residuaries, then the failed or lapsed legacy of a portion of the general residue itself must be deemed to have been unprovided for and to have passed as if testator had died intestate in respect thereto. This one-fifth of the general residue, therefore, was inherited by testator's daughter as his only heir and distributee under the Statute of Descent and Distribution.

Similarly, the trust under subdivision C to pay income on one-quarter of the residue to the wife for life has lapsed; and the corpus of this trust became an addition to the trust under subdivision D on " the remaining nine-twentieths " of the residue for the benefit of testator's daughter. These two provisions for testator's daughter, under subdivisions C and D, were not dependent on the survival of any one other than the daughter herself; and they remain valid and enforcible, as is also the trust under subdivision A on one-tenth of the residue for the benefit of the two named hospitals. In using the term " residue " there is no intention of including either the personal property that is to be set apart as exempt to the infant under section 200 of the Surrogate's Court Act, or the nine-tenths of certain merely appointable property hereinafter mentioned.

V. The petition also asks that the will be construed in regard to the power of sale. By the eighth paragraph testator gives and grants to the executors and trustees named in the will " full power and authority to sell and convey any and all real estate of which I may die seized, at such times and upon such terms as they may deem proper." Testator's estate at the date of this will was substantially the same as it was at his death eighteen months later. Less than two per cent of the estate was in real estate. The rest of the estate, estimated at about four million dollars, was in personalty. The estate is abundantly solvent.

In the plan set out in the will permission is given the trustees to make advances to enable testator's daughter to purchase a house; but aside from that, there is no direction that the trustees either do, or do not invest in land.

To carry out the will, it will be necessary for the executors to divide the estate in four unequal parts, two of which were to be set

up as trusts. The portion given to the charities is distinctly in the form of personal property. The trustees, of course, having by statute the legal title to the land in themselves as such, would have power to sell, even though their name did not appear, as it does, in the power of sale conferred by the will on both the executors and the trustees. The executors, without such broad grant, would still have power to sell under section 13 of the Decedent Estate Law.

In some circumstances wills have been read so that a naked power of sale, alongside an absolute devise, has been held insufficient to carry title to the devised land; but in other settings a reading of the will as a whole indicated testator had implicitly subjected the devise to the exercise of a power to sell for any purpose advantageous to the estate or convenient to the execution of his testamentary plan. In the peculiar circumstances of this case, it is clear that the several residuary legacies, although not gifts made expressly out of the proceeds of sale of land by the executors, are yet gifts immediately to follow a division of the inclusive residue by the executors in order to distribute the several fractions and to set up the two trusts. It is also clear that in the paragraph conferring the power of sale there is no mention of the purposes for which it may be exercised, still the power is general in scope; and is not dependent, even by implication, either on the legacies reaching the legatees or on the trusts being accepted, effectual or valid. In that setting, the residuary provisions, being intended to include everything not otherwise bequeathed or devised, come under the rule that subjects not only a devise to the power of sale, but also all realty falling into the residue for any reason, such as lapsing or invalidity, etc. In such cases the feature that a division was to be made which would avoid partition, appears to have been decisive in *Kinnier* v. *Rogers* (42 N. Y. 531); *Cussack* v. *Tweedy* (126 id. 81); *Matter of McCafferty* (147 Misc. 179), and in *Friedbar Realty Corp., Inc.,* v. *Sanford* (119 id. 621). Among like rulings are some which extend to the corpus of invalidated trusts or legacies a general power of sale in executors or trustees despite the invalidity of the legacies or trusts, to wit, *McCready* v. *Metropolitan Life Ins. Co.* (83 Hun, 526; affd., 148 N. Y. 761); *Lindo* v. *Murray* (91 Hun, 335; affd., 157 N. Y. 697), and *Markert* v. *Solomon* (217 App. Div. 275).

Under this will, therefore, the executors must be deemed to have power to sell any and all real estate that formed part of testator's estate at the time of his death (as distinct from merely appointable property), notwithstanding some relatively small portion was to go to satisfy a legacy that lapsed, and despite the fact that some

of it testator had not foreseen would fall into the residue of his estate, by reason of the simultaneous death of himself and his wife. The fact that a part of the residual estate passes to testator's only heir as in intestacy, rather than by devise, does not take it out from the power of sale which is given both to the executors and to the trustees.

All of the real estate mentioned herein is outside the classification of merely appointable property.

VI. Aside from the property of testator mentioned above, there is other property over which testator had only power of testamentary appointment. He had two such powers, both conferred by his father, Henry G. Strong, one by his father's last will, and the other by an *inter vivos* deed of trust. (Exhibit 6.) The former may have been intended in the head of the residuary clause in this testator's will where he says he has "in mind the provision of the will of my father;" but the latter power clearly is intended in the sequence of that clause which includes "any and all property with respect to which I have a power of appointment, or which I am authorized to dispose of by will."

In and by his father's will this testator after having reached the age of twenty-five was given power to appoint by will before he became thirty, the principal of the testamentary trust that was to become payable to him upon his reaching the age of thirty. This became outgrown and obsolete in the donee's lifetime, for he died the owner thereof in his thirty-second year. The discussion of powers, therefore, may be confined to the *inter vivos* trust, to wit, the other power to appoint which originated in a deed of trust (Exhibit 6) made in 1917 by his father whereby the income of this fund was to be paid to this testator during his lifetime; and upon his death the trustee was to pay the principal to such persons as would take had he, the beneficiary, died intestate and the owner thereof, subject, however, to this exception, that the trust deed conferred on this beneficiary a general power to appoint this fund by his last will, provided he executed such will at any time after he arrived at his majority. This condition was met ten years after majority when this testator in his last will made express reference to his power to appoint whatever he could.

As to such appointable property, under the deed of 1917, testator partially failed to make an effective appointment. His testamentary plan was frustrated by the unprovided for and simultaneous death in so far as he left one-fifth of the general residue to his wife absolutely; and also in respect of the trusts set up in subdivision C on a quarter thereof for life income to his wife, with the remainder over for their daughter to be added to the other trust on the

remaining nine-twentieths of the residue under subdivision D for income to the daughter until she became thirty-five, with remainder over on her death to her legal representatives; because the resultant tacking of lives, the third of which was not in being in 1917, would amount to an illegal suspension. (*Matter of Brown*, 169 Misc. 43.) " An illegal appointment is no appointment." (*Low* v. *Bankers Trust Co.*, 270 N. Y. 143, 148.) With the exception of one-tenth thereof testator cannot now be said to have duly appointed, willed or conveyed this particular fund in the trust of 1917 to any one.

The contingency was provided for in the deed of trust itself, to the effect that on his death, without having exercised the power to appoint this fund by will, the trustees are directed to pay this principal fund " to such persons as would take had he died intestate and the owner thereof." This direction on the part of the father who created this trust made it unnecessary to have the father's legal representatives brought in as parties to this accounting proceeding. His executor has appeared in this proceeding.

No part, therefore, of this *inter vivos* trust fund passed to the widow under subdivision B, nor to the testamentary trustees under either subdivision C or subdivision D of the general residuary clause of this testator's last will. However, one-tenth of the residue did pass to the hospital beneficiaries under subdivision A of this general residuary clause; but all the rest of this *inter vivos* trust fund passed to testator's minor child from her grandfather at her father's death as if the latter had died intestate as to this particular fund. Nine-tenths of this fund will come under the control of the general guardian of the property of testator's only heir, Ann Emerson Strong.

VII. To compromise a dispute whether there had been a donative ademption of a legacy of specific stock to C. A. Quakenbush in the will of testator's father, Henry G. Strong, the latter's executor, with judicial approval, set up a trust (Exhibit 5) on January 28, 1924, to deliver the corpus and any increment, upon the death of the legatee beneficiary, " to such person or persons as are then entitled to the possession of the residuary estate of said Henry G. Strong, according to the provisions of his will." The will of H. G. Strong gave his residuary estate in trust to be divided between his two named sons, the third and last installment to be delivered to each at the age of thirty. This was but a deferring of payment in case the son did become thirty. Upon reaching that age — as in fact each son did — the trust ceased, and the son became the outright owner of this residuary interest and not the mere donee of a power to appoint it by his last will. There thus became ineffective the more elaborated substitutions that the father's will contains

for the event of either son dying before thirty, with or without widow, or children, or both so; and that then either the descendants or widow were to take; or failing those, the survivor; or the heirs of testator, etc., all of which is subject to this proviso: " Provided, however, that either or both of my said sons may, after attaining the age of twenty-five (25) years, by his last will and testament, dispose of such unpaid and undelivered share of the principal of his trust fund to whomsoever he may by such will appoint." By law each son after having become eighteen could will away whatever he had then actually been paid. The proviso just quoted relates only to the portions " unpaid and undelivered " to the son before he had become thirty. As to those his father gave him a power of testamentary appointment, while he was between twenty-five and thirty, if he made a will after twenty-five. The expression of this limitation on unpaid portions is to be taken as the exclusion of any like limitation as to such portions as had already been paid and delivered to the son before he had become thirty. Obviously, what was or should have been paid and delivered to him at or after thirty became ultimately his absolutely, and not merely his to appoint. By fair implication, therefore, the two sons having passed the age of thirty, must now be regarded as the general residuary legatees of their father, without any restriction or limitation on their powers or rights.

The corpus of the Quakenbush trust does not fall in the class of merely appointable property in the estate of Pritchard H. Strong. Primarily, this legacy of stock was not intended by testator for either son; but through the executor's post-mortuary compromise a possible benefit to the sons came into existence. Until the compromise was effected, any interest this testator, Pritchard, acquired in the general residue of his father's estate, would pass under the general residuary provisions of this son Pritchard's last will, as his own, rather than as appointable property. However, the compromise by his father's executor might be read to have impressed a peculiar character on this particular corpus that it never possessed before, in that this corpus, by the terms of the compromise, is to be delivered, upon the death of the beneficiary legatee Quakenbush to possessory, rather than to merely proprietary interests in the residue of the quasi-creator's estate — that is to say — this corpus is to be delivered " to such person or persons as are *then* entitled to *possession*," which might imply that persons dying during the lifetime of the beneficiary Quakenbush would lose whatever proprietary expectation they had of obtaining this property, because they would have to be living at the death of the life beneficiary to be " then entitled to possession " of the corpus of this compromise trust.

However, the wording of this compromise trust, as counsel for the charities has pointed out, reflects the fact that it was made when this testator, Pritchard H. Strong, still had twelve years to live before he would become thirty; and his thirtieth birthday was an important date in his father's testamentary plan.

One may well doubt that H. G. Strong's executors, after his death, had either the power or the intention to vary the residuary provisions of his will by making them even more defeasible than he himself had done. For those reasons it seems better both to read this peculiar residuary provision of the Quakenbush trust more liberally than to emphasize the words " then entitled to possession," and also to hold, consistently with the main residuary provisions of the will itself, that the underlying corpus of this compromise trust became the property of his two sons as of the date of their father's death, subject only to the life use of C. A. Quakenbush. Accordingly, the vested right of Pritchard H. Strong to half of this corpus, subject to that life use, passed at his death as his own under the residuary provisions of his will, and not alone by an express or implied appointment by him.

Upon the death of the life beneficiary, the executors of H. G. Strong will deliver the share of his son, Pritchard, to the latter's executors, through whose hands it will pass, with the rest of his estate, as outlined in this decision generally.

VIII. The remaining question concerns the allocation of estate or inheritance taxes imposed on a revocable *inter vivos* trust (Exhibit 4) that was set up by testator in 1930 for his infant daughter, with securities of the face value of about $490,000. This deed of trust is silent on the source whence such taxes on it are to be paid; but his last will, disposing of seven times the amount of this trust, speaks twice as to that sort of taxes, *first*, in paragraph " third," where he refers to the general residue, " all of which, less however taxes and administration expenses is hereinafter sometimes referred to as my ' net estate;' " and *second*, in the " tenth " paragraph, where testator did " direct that all succession or inheritance taxes and all taxes payable with respect to any bequest herein contained, shall be paid by any executors as an expense of administering my estate." The death taxes thus charged to general residue appear to be divided into two groups in this " tenth " paragraph; *first*, the general group of " all succession or inheritance taxes;" and *second*, the particular group indicated by the words, " and all taxes payable with respect to any bequest herein contained." Testator was aware of the fact that he had some non-testamentary trusts, outside his will, that would be liable to death taxes; and he also knew that his testamentary trusts or provisions would likewise be taxable at his death. The language of his

" tenth " paragraph is well adapted to meet that diversified situation.

The wording of this particular paragraph is broader than that in *Matter of Clark* (169 Misc. 202), where the direction was a general, undivided one that " all State and Federal inheritance, transfer or estate taxes be paid by, out of and as charge against any legacies herein contained." Similarly limited to property passing under the will is the direction in *Matter of Rogers* (159 Misc. 86; affd., 249 App. Div. 238) that " all inheritance, transfer, legacy, succession or similar duties or taxes, which shall become payable in respect of any property or interest passing under this my last will and testament, or any codicil I may make hereafter, shall be paid out of the capital of my residuary estate." In the case of *Farmers' L. & T. Co.* v. *Winthrop* (238 N. Y. 488) the court did not extend beyond provisions of the will the scanty direction therein that " all inheritance taxes be paid out of my general estate."

The peculiar wording of this particular will now in hand indicates that testator intended the net general residue to bear the succession or inheritance taxes on his relatively small fund in the nontestamentary trusts as well as " all taxes payable with respect to any bequest " in his last will contained. This brings the case within the exception made in section 124 of the Decedent Estate Law for a specific direction, other than proration, made by testator in his last will.

IX. Another question has arisen under the *inter vivos* trust created by testator for his infant daughter on December 3, 1930, by deed of trust (Exhibit 4), with the Lincoln Alliance Bank and Trust Company. This trustee paid $100,000 to the executors of the settlor, as set out in Schedule A1 of the account. This sum, apparently, had been loaned by the executors to this trust to facilitate its payment of taxes; and was later repaid to the executors. Concededly this repayment could not be regarded as an increment of the estate for the purpose of computing commissions.

Under the ruling that the residue of the estate must bear such taxes, the special guardian correctly takes the position that this sum must be restored to the trust.

X. After the decision rendered herein under date of March 31, 1939, a reargument was had; and this present decision must be deemed to be amendatory and in lieu of the previous decision aforesaid.

On notice, or appearance of counsel, submit for signature and entry a decree framed in accord with this decision. with provision for allowances.